UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. –<br><br>CRYSTAL GROTE<br><br>Defendant. | 16 Cr. 91 (PKC)<br><br>Sentencing Date: 9/11/19 |

# DEFENDANT CRYSTAL GROTE'S
# MEMORANDUM IN AID OF SENTENCING

Barry A. Bohrer

SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000
barry.bohrer@srz.com

*Attorneys for Defendant Crystal Grote*

**TABLE OF CONTENTS**

**Contents**

| | | |
|---|---|---|
| **I.** | **INTRODUCTION**..................................................................................................1 | |
| **II.** | **SENTENCING CONSIDERATIONS**.................................................................2 | |
| | A. The 3553(a) Factors Counsel in Favor of a Non-Custodial Sentence ......................2 | |
| | 1. Crystal's History and Characteristics ..........................................................2 | |
| | 2. The Nature and Circumstances of the Offense ............................................7 | |
| | 3. The Applicable Guidelines Range ...............................................................9 | |
| | 4. Crystal's Substantial Assistance.................................................................10 | |
| **III.** | **SENTENCING REQUEST**................................................................................11 | |

**I.     INTRODUCTION**

On behalf of defendant Crystal Grote, we respectfully submit this memorandum in anticipation of her sentencing, scheduled for September 11, 2019.  Crystal pled guilty to a single count of making false or misleading statement during a deposition regarding the payday lending scheme that was orchestrated by her former employer, Scott Tucker.  As the Government has acknowledged, Crystal was not charged as a principal in Tucker's crimes because she did not possess an intent to commit those crimes.  Crystal voluntarily and fully cooperated with the Government's investigation, provided extensive and truthful testimony at trial, and has accepted responsibility for her wrongdoing.  For her efforts, the Government has moved pursuant to §5k1.1 for a sentence below the Guidelines range, and the Probation Department has recommended a non-custodial sentence.

In submitting this memorandum and the attached supporting letters, we seek to put Crystal's mistake in context to show that it does not define her:  a loving, hardworking and selflessly devoted mother of two young children who is relied on by friends and family, and who is committed to giving back to the community.  The offense that brought Crystal before this Court was motivated not by greed or a desire to live a lavish lifestyle, but rather an unwavering sense of loyalty to the only employer she had ever known.  The letters submitted to the Court illustrate that throughout her life, Crystal has, for better or (in this case) worse, steadfastly stood by those around her in the darkest of times, and in the face of unimaginable grief.  After losing her first husband to a five-year battle with ALS, today, Crystal cares for her two young children, her 18-year old niece, and her ███████████████████████████████████ ███████████  Simply put, losing Crystal for any period of time would carry devastating consequences to those who depend on her.

The Government does not object to the Probation Department's recommendation that a non-custodial sentence is appropriate in this case. We respectfully submit that, upon consideration of Crystal's conduct and character, the nature of her offense, and the substantial assistance she rendered to the Government, a non-custodial sentence be imposed.

## II. SENTENCING CONSIDERATIONS

The Court must "impose a sentence sufficient, but not greater than necessary," to comply with the statutory purposes of sentencing. 18 U.S.C. §3553(a). The Guidelines range, although not binding on the Court, is one of the factors the Court must consider in determining a just and reasonable sentence. 18 U.S.C. §3553(a)(4). The Guidelines are not to be presumed to result in a sentence that complies with the statutory purposes of sentencing, however. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curium). The Court "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and the defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). The justification for a non-Guidelines sentence need be only "sufficiently compelling" in light of the individualized assessment under 3553(a). *Gall v. United States,* 552 U.S. 38, 50 (2007). A sentence outside the Guidelines range does not require the sentencing court to find "extraordinary" circumstances, because such a requirement would "come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Id.* at 47.

A. The 3553(a) Factors Counsel in Favor of a Non-Custodial Sentence[1]

1. Crystal's History and Characteristics

Crystal Grote is a 39-year old mother of two and the guardian of her 18-year old niece. She was born and raised in Cleveland, Missouri, where her parents still reside. Crystal

---

[1] The PSR accurately recounts Crystal's personal and professional background, which we adopt in full and reference herein.

2

was always a "good kid, well-mannered and respectful of everyone." (Ex B-5). Her father Rick, and her mother, Nita, have been married for 40 years, and still live in Crystal's childhood home. Nita describes Crystal as "a truly kind hearted and caring person." (*Id.*)

Crystal "worked very hard to make good grades" growing up, balancing her academic responsibilities with her affinity for playing sports. (*Id.*) She received a full scholarship to Southwest Missouri State University in Springfield, Missouri, where she attended school for two years before returning home to Cleveland to gain employment, in part because it was so difficult for her to be away from home. (*Id.*)

In 1998, at just the age of 19, Crystal was hired by Scott Tucker for an entry-level position to work at his payday lending business. As Tucker's payday lending enterprise grew, Crystal became manager of one of his lending portfolios. Her responsibilities gradually increased over time. In 2017, upon voluntarily choosing to cooperate with the Government's investigation, she left the company after a nearly 20-year tenure.

(a) Unwavering loyalty to those who depend on her

In the face of personal tragedy, Crystal has demonstrated a remarkable sense of commitment to those around her. The letters submitted on her behalf show that she is someone who can be relied upon, through thick and thin, no matter how dire the circumstances.

Just five months after marrying her first husband, Robert, in 2005, Robert was observed by his colleagues at work to be unsteady. The news from the doctor's appointment that followed was devastating: a diagnosis of Lou Gehrig's Disease ("ALS"). For the next four years, Crystal never left Robert's side. Maintaining her full-time job, she cared for Robert, tending to his needs as his prognosis grew worse. The death of Robert took a "huge emotional toll" on Crystal, but Crystal to this day still maintains a close relationship with Amber, Robert's daughter from a previous marriage.

3

Around the same time as Robert's diagnosis, Crystal's father, Rick, ███████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████ Crystal is "an incredible child to her wonderful parents." (Ex. B-6.) She has been essential to ███████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ (Ex. A-1). Crystal checks in on them daily, helping them with anything that needs to be done, whether it be cooking a meal, buying new clothes, or repairs around the house. (Ex A-1; Ex. B-1, B-2, B-3.) Without her, Crystal's father candidly wonders what consequences would follow. ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████ (Ex. B-2.) And, ███████████████████████████████████████████████████ ███████████████████████████████████████████████." (*Id.*)

In addition to caring for her father, Crystal has also borne the responsibility of raising her teenage niece, Grace.  Because Grace's parents were unable to support her, and like so many other times in her life, Crystal stepped up voluntarily, and without hesitation.  Grace moved into Crystal's home in 2018.  Grace's grandmother recounts that Crystal has been "one of the main sources of stability Grace has." (Ex. C-1.)  Crystal helps Grace "so much with her homework and getting set up for college" and has "instilled in Grace to work hard and be kind, loving and giving to everyone." (*Id.*)

Grace echoes the sentiment of her grandmother, showing deep gratitude and appreciation for Crystal's loyalty to her.

4

> "[M]y Aunt Crystal opened her doors for me. She allows me to live with her, and she cares for me like a parent. I have shelter, food, clothing, and opportunities because of my Aunt Crystal. I am not sure where I would be or what I would be doing if it weren't for her support…She is definitely the person I look up to the most."

(Ex. B-4.) As a senior in high school, Grace is currently preparing for college, and Crystal is indispensable in the process as both a provider and role model. (*Id.*) Crystal "instills the importance of a great education and pushes [the] kids to be great thinkers." (Ex. B-1.) Despite conversations trying to explain her conviction, all three kids "love and look up to Crystal greatly." (Ex. B-1.)

Shelly Burton writes of the profound effect a custodial sentence would have on Grace. "I know that if she were to have to go away it would devastate so many people, young and old…. I have seen first-hand the time, love and effort that she has put into everything she does, including my granddaughter, her children, her marriage, our schools…and so much more." (Ex. C-1.)

(b)   "Turns difficulty into blessings"

Out of the heartbreak of Robert's death, Crystal sought to do something good. She created a charity called Traveling Turkeys, which donates Thanksgiving meals to families who, like Crystal, were bearing the weight of caring for an individual suffering from ALS or MS. As Crystal's mother aptly describes: "She knew how hard it was, mentally and physically, to get out and to shop for Thanksgiving dinner, so she wanted to help others in the situations she was in. So she put together a basket of things…and delivered them to ALS and MS families." (Ex. B-3.)

In its first year, Traveling Turkeys exceeded expectations by raising funds for 80 meals to donate to families in need. The charity has since grown to more than 5,000 meals donated. (Ex. B-1.) It donates not only to families of ALS and MS patients, but also to

5


organizations that help other people in need, including disabled veterans, pediatric cancer patients, and families who are dealing with suicide.

Crystal's husband Jason recounts reading the many thank you letters that have poured into their home after each successful drive. He says that Crystal is motivated, but not by a desire for praise or recognition. Rather, beyond her "selfless" desire to help others, Crystal experiences happiness in bringing moments of joy to families that have suffered ultimate tragedy. (Ex B-1.) Crystal's philanthropy reflects how she is "truly a loving, kind-hearted person." (Ex A-5.) Relative Margaret Hoehn recounts how on one Thanksgiving, a woman receiving a basket from Traveling Turkeys called Crystal explaining how she didn't have an oven to cook the turkey, so Crystal decided to buy and send her a range (Ex. B-8).

Traveling Turkeys is only the first of Crystal's charitable endeavors. In her grandmother's memory, Crystal started making care packages for both nursing homes in her community so that the elderly would not feel forgotten during the holidays. (Ex. B-1.) Crystal goes out of her way to spend time at the nursing homes so that others do not feel alone. (*Id.*)

Crystal actively volunteers her time with other charitable organizations, including Uplift and The Starfish Project, both of which help the homeless population (Ex. B-1.) In the winter, she helps collect coats for those who need them. (*Id*.) She continues to sponsor and support the academic and scholastic efforts of her high school *alma mater* Cass Midway, even helping with school fundraisers for her cousins, Serena, Sierra, and Michael Sparks (Ex. B-3; Ex. B-5; Ex. C-2).

Crystal makes sure to include all three of the children actively involved in her charitable endeavors so that she may "ensure that they too will be givers to society." (Ex. B-1.) Instead of accepting gifts for her children's birthday parties, she donates those gifts to Children's

Mercy Hospital, where they may be enjoyed by others who are more in need. Crystal strives to ensure her children will "learn by giving" (Ex. B-7.). As Cheryl Castobile put it: "I don't know how [Crystal] turns difficulty into blessings for others but I watched her do this for years and she still continue." (Ex. B-7.)

        (c)    "Great regret and remorse"

Crystal's letter to the Court expresses the "great regret and remorse" that she feels for her actions, and the determination that drives her to learn and grow from her mistake. (Ex. A-1.) She feels that way not because she is a defendant facing the imposition of a sentence, but because she let down those around her.

Crystal strives to be a role model to her two children and her niece. She recognizes that she "should have been focused on the example [she] was setting for [her] daughter," lamenting that it disappoints her especially that at the time of her offense, she was a brand new mom. (*Id.*) She "dread[s] the day [her] little ones find out about this" and prays "that I can do enough between now and then to soften the blow of embarrassment and confusion this will cause them." (*Id.*)

Crystal's husband writes that she has "taken this hard time in our lives to discuss what's happening to her," and the "consequences" she faces. (Ex. B-1.) She has done this "to further educate on the importance of honesty and integrity." (*Id.*) She fights back her emotions around the children, but will "cry it out" when she has the opportunity. (*Id.*) Crystal also fears what will happen to her father if she is no longer able to care for him, by cleaning the house, driving him to appointments, and tending to any and all of his needs.

    2.    The Nature and Circumstances of the Offense

Crystal pled guilty to making "evasive statements" which "although perhaps not technically false, obscured or effectively denied damning facts about Tucker's business." (Gov't

7

Sentencing Letter at 3.)  Specifically, Crystal "evaded questions about employees receiving daily weather reports for locations of the Indian Tribes involved in the scheme, so that employees could more effectively deceive borrowers into thinking they were speaking with someone located on those Tribes' reservations."  (*Id.*)

The nature and circumstances of Crystal's offense should not be conflated with the conduct of Tucker and Muir, her former employers.  In the 31 paragraphs of the PSR devoted to "offense conduct" charged in the *Tucker* matter, Crystal's name is mentioned not even once.  Indeed, the Government has explicitly recognized that Crystal "did not possess an intent to commit the charged crimes" in the *Tucker* matter.  (Gov't Sentencing Letter at 5.)  Accordingly, "[her] culpability is vastly lower than that of Tucker or Muir." *Id*.  Rather, Crystal blindly and faithfully followed instructions she was provided, having told call center employees to inform borrowers that they were located on tribal reservation, and having engaged in discussions about changes to loan terms based on her "credibl[e]" belief from Muir that the terms of those loans were legal.  (*Id.*)

For her entire life, Crystal has demonstrated a willingness to place the interests of others above that of herself.  Her conduct during her deposition with the FTC was no different.  Both the PSR and the Government correctly attribute Crystal's offense to the same personal characteristic: loyalty.  Scott Tucker extended Crystal a lifeline by hiring her—then a college dropout—at the young age of 19.  He fostered her trust with a steady income, periodic promotions, and increasing job responsibilities, in what for many years appeared to be a remarkable story of success.  At the peak of her professional career with Tucker's business, Crystal was responsible for overseeing numerous employees in the call centers as a senior portfolio manager, but was still receiving and implementing instructions from Tucker and Muir.

The Government is correct when it observes that this "appears to have been an unsophisticated employee who was far too loyal to Tucker and trusting of Muir's expertise." (*Id.* at 3.) That was Crystal's mistake during her deposition in 2013, and that is the nature of the offense on which she should be sentenced.

### 3. The Applicable Guidelines Range

Because Crystal pled guilty to a violation of 18 U.S.C. § 1001, the PSR assigns a base-offense level of six. Accounting for her acceptance of responsibility and her cooperation, which reduce the offense level by a total of three, the applicable offense level is three, and the corresponding Guidelines Range is 0-6 months. We respectfully submit that the analysis should end there.

However, the PSR mechanically dumps the entirety of Tucker and Muir's conduct at Crystal's feet by applying a draconian 30-level increase based on a loss amount of $550,000,000. It also ascribes a two-level increase because Tucker and Muir's offense involved more than ten victims and involved mass marketing. Accordingly, the PSR drives the applicable offense level from three to 35, taking the Guidelines range from 0-6 months to 168-210 months. Because the statutory maximum sentence for her violation—60 months—is far less than the Guidelines range of 168-210 months, the PSR concludes the appropriate sentencing range is 60 months.

We noted our objection, reflected in the PSR, that the 32-level enhancement for Crystal's role in a crime for which she was not charged, and for which the Government *concedes* she had no criminal intent to commit, was plainly improper. *See United States v. Studley,* 47 F.3d 569, 574 (2d Cir. 1995) (the mere fact that an employee worked alongside others in a boiler room setting was insufficient to attribute to him the other employees' frauds). Nonetheless, the PSR justifies the application of a $550,000,000 loss because Crystal "was steadily promoted"

9

and "played an integral part in providing administrative support for [Tucker's] business." Respectfully, that is wrong. As the Government notes in its §5K1 letter: Crystal "credibly explained that she believed [the loan policies] were legal based on her consultation with Muir, and generally relied on Tucker and Muir for her understanding of how the industry was supposed to operate." Accordingly, we agree with the Government that "Grote should not be held liable for the charges in *Tucker*" in this fashion.

In any event, the PSR recommends—and the Government does not object—that the appropriate sentence here is a non-custodial one. This conclusion is supported both by the recognition of Crystal's limited role in the offenses committed by Tucker and Muir, and by the substantial cooperation she rendered to the government.

    4.    <u>Crystal's Substantial Assistance</u>

Upon motion of the government "stating that the defendant has provided substantial assistance in the investigation or prosecution of another person," the court may depart from the Guidelines. U.S.S.G. §5K1.1. The appropriate reduction should include considerations of: (1) the evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defednat; (3) the nature and extent of the defendant's assistance; (4) any injury suffered, or any danger or risk of injury to the defendants; and (5) the timeliness of the defendant's assistance. *Id.* at §5K1.1(a)(1)-(5).

[text redacted]

10



Accordingly, Crystal's substantial cooperation should be a substantial factor in arriving at an appropriate sentence.

### III. SENTENCING REQUEST

Based on her "vastly less culpable" role in the conduct for which her former employer has been charged and convicted, her life of devotion and charity, and the substantial assistance she rendered to the Government, we respectfully submit that the appropriate punishment, as the PSR recommends, is a non-custodial sentence.

Dated:  New York, New York  
        August [  ], 2019

SCHULTE ROTH & ZABEL LLP

By: /s/ Barry A. Bohrer  
    Barry A. Bohrer

919 Third Avenue  
New York, New York 10022  
(212) 756-2000  
*Attorneys for Defendant Crystal Grote*

11